No. 33,599

BLANCHE ANDERSON, *Appellee*, v. MRS. L. W. SHANNON, *Appellant*.

No. 33,600

NEWTON REYNOLDS, *Appellee*, v. MRS. L. W. SHANNON, *Appellant*.

(73 P. 2d 5)

Opinion filed November 6, 1937.

*L. E. Helvern*, of Hiawatha, *Dean McElhenny* and *Philip C. Gault*, both of Topeka, for the appellant.

*Walker F. Means* and *John L. Gernon*, both of Hiawatha, for the appellees.

The opinion of the court was delivered by

WEDELL, J.: These appeals are taken by a defendant owner of real property, consisting of a theater building, from two rulings.

The principles involved in the rulings are the same in each of the two cases. The first involves an order overruling the motion of defendant to set aside an execution sale on the alleged ground the property constituted defendant's homestead. The second pertains to the confirmation of sale.

Two separate creditors filed actions and obtained money judgments against defendant. General executions were issued to satisfy the judgments. Separate sales of the theater property were had pursuant to the respective executions. On June 25, 1937, this court consolidated the appeals. Evidence was offered by defendant in support of her motion to set aside the sales on the ground the theater building constituted a homestead. It was agreed the evidence offered on the motion in the one case should govern both cases. Plaintiffs offered no evidence. Upon consideration of the evidence, arguments and briefs, the trial court found:

". . . the real estate above described and claimed as a homestead by Mrs. L. W. Shannon was chiefly valuable and mostly used by her for business purposes; that Mrs. L. W. Shannon was not and is not the head of a family and said real estate is not the homestead of Mrs. L. W. Shannon; and that said motions should be overruled."

We shall consider, first, the finding pertaining to the homestead character of the property. If the evidence sustains that finding, it will, of course, be unnecessary to determine whether defendant was the head of a family. Plaintiffs having offered no evidence, we are not confronted with the problem of conflicting testimony. Does the evidence on behalf of defendant, together with reasonable inferences which might properly be drawn therefrom, support the finding of fact, to wit: "the real estate above described and claimed as a homestead by Mrs. L. W. Shannon, was chiefly valuable and mostly used by her for business purposes." It will be observed this statement in fact embraces two separate and distinct elements. The first is that the building was chiefly valuable for business purposes. The second is that it was mostly used for business purposes. Do these elements, or either of them, if supported by substantial evidence, affect the homestead character of the property?

In substance, the testimony of the defendant, Mrs. Shannon, was: She was the widow of Dr. L. W. Shannon, deceased; they had no children of their own; Doctor Shannon died December 3, 1931; prior to his death they had not occupied any part of the theater building as a homestead, but had lived in a residence property on

Shawnee street in the city of Hiawatha for about twenty-eight or twenty-nine years; the doctor's office in the theater building had consisted of four rooms; in the month of May, 1933, defendant decided to move from the residence on Shawnee street into the office rooms formerly occupied by her husband in the theater building, and at that time had her trunk, some dishes and some clothing moved to the theater; a nephew by the name of John Voenida had come to live in her home on Shawnee street in December, 1932 (one year after her husband's death), and defendant had his bed moved into a room on the second floor of the theater building when she first moved some of her belongings into the theater building; they had slept in the theater building since July 27, 1933; there was a mortgage on the residence property, and she tried to get a government loan to take up the mortgage, but was unsuccessful; she designated the residence property as her homestead; she thought the application for the loan was made at a time when she still had most of her things in the residence property; in addition to the four office rooms occupied by defendant she used one room for the storage of her husband's X-ray equipment, and had moved some of her belongings into the east end of the basement under the lobby part of the theater; one furnace heated the entire building, and the thermostat was located in her rooms; the theater building is approximately 140 feet long and 50 feet wide; it is a two-story building; the first floor is rented for theater purposes and the operator of the theater subleased the southwest part of the first floor to Pete Harnack, in which the latter operated a candy kitchen; the portion of the basement under the candy kitchen is occupied by Pete Harnack; there is a lobby east of the candy kitchen and a front stairway separates the theater on the east from the candy kitchen on the west; there is a foyer between the candy kitchen and the theater; from it a stairway leads to the second floor; the second story extended back about one-half the distance of the first story; the second floor contained one large room and two smaller ones, which were rented to an operator of a beauty parlor; there is an entrance to the rear of the second story and a stairway to the alley.

The witness, Patton, secretary of the Hiawatha Savings and Loan Association, called as a witness by defendant, testified in substance: The association held a mortgage on the theater building, which mortgage had been reduced to about $20,400 or $20,600, and there were delinquent taxes on the building in the sum of about $340;

THEATRE

Area 1st. floor Approx. 7000 Sq.Ft.

Lobby

Foyer

Store Room

Stage and Pit

140'

50'

FIRST FLOOR

N

NOTE

▨ Area Occupied by
Elizabeth Shannon
Approx. 738 Sq. Ft.
Total Floor Space Of
Building & Basement
12,800 Sq. Ft.

Room of
John
Voenida

ROOM

SECOND FLOOR

N

the $300 monthly rental from the theater had been assigned by defendant to the association and the association applied about one-half of that amount on the mortgage and interest, about $50 of it went to the defendant, and the balance was used for heating the building, taxes, insurance and upkeep.

According to the diagram of the building, herein shown, there are five rooms on the second floor, in addition to those previously mentioned. The diagram shows a hallway through the center and south portion of the second floor, making access therefrom available to the various rooms. Plaintiffs say one of the rooms is a real-estate office and another a dental office. The record before us does not indicate whether those two rooms were occupied, and if so, what rental, if any, was received therefor. The record before us does not disclose how much revenue is realized from the second floor, but plaintiffs tell us the fair annual income from the second floor is about $1,320. This statement is not denied by defendant. If that amount be correct the total annual rental of the theater building is about $4,920. Irrespective of the exact amount that may be received as rental from the second floor, we may take cognizance of the room space, other than that actually rented, which is designed for business purposes. According to the diagram the space occupied by defendant is approximately 738 square feet. The total floor space of the building, including basement, first floor, balcony and second floor, is 12,800 square feet.

The first of the two creditors' suits was filed August 17, 1933. Plaintiffs direct our attention to a conveyance of the theater property by defendant, dated September 2, 1933, and to a reconveyance of that property to defendant on November 1, 1933, and state that the note upon which the plaintiff Reynolds obtained judgment had been given by defendant and her husband for work and labor performed on the theater. The Reynolds action was not brought to foreclose a lien. Furthermore, these facts, assuming they are true, were not made a part of the record and we cannot consider them. Our treatment of the question must be restricted to the record. What does it disclose?

That the theater building was constructed for commercial purposes is evident from its general design and detailed arrangement. That it was used solely for business purposes and that no homestead character had attached to it during the life of defendant's husband is conceded. That it continued to be mostly used by de-

fendant for business purposes after defendant moved into it, is equally clear. It is thus apparent the first portion of the trial court's finding, to wit: "was chiefly valuable and mostly used by her for business purposes," is amply supported by evidence.

For the moment we may entirely disregard the business character of the theater building and assume defendant was claiming exemption of an ordinary residence which had acquired no homestead character at the time of her husband's death. Clearly she would not have acquired it as a homestead under the law of descent and distribution. (G. S. 1935, 22-102.) That statute requires occupancy of the property as a residence by the intestate and his family at the time of his death and a continuance of such occupancy after his death. True, it has been held that when the homestead character has once attached it may persist for the benefit of a single individual (either the husband or the wife), who is the sole surviving member of the family. (*Weaver v. Bank,* 76 Kan. 540, 94 Pac. 273.) In the instant case the homestead character had not attached to the theater building prior to the death of Doctor Shannon, but had attached to the Shawnee street residence. This case does not present the question frequently arising from the sale of one homestead and the purchase of another from the proceeds of the sale of the former.

We are not unmindful of our former decisions to the effect that the renting of a part of the premises for revenue for the support of a family is not necessarily inconsistent with the homestead character of the property. (*Layson v. Grange,* 48 Kan. 440, 29 Pac. 585; *Savings Bank v. Ayers,* 48 Kan. 602, 29 Pac. 1149; *Barten v. Martin,* 133 Kan. 329, 299 Pac. 614.) It is well to bear in mind the homestead character in those cases had previously attached, and the question therefore was not whether an established homestead could be abandoned and a new one acquired in property which had not only been designed and constructed for, but which was then being used solely as, a commercial building. The question in those cases was simply whether the renting of a portion of the premises to which the homestead character had previously attached was so inconsistent with its homestead character as to cause it to lose that character. Moreover, there is no showing in the instant case that the $50 received by the widow out of the theater rental or any other rental from the building was used for the purpose of supporting a family, assuming she had a family. For aught that appears in the record such revenue may have been used for business or other purposes and her support may have come from other independent sources.

So, too, in other cases relied upon by defendant, the question was whether certain later uses of parts of a building or parts of the city or rural premises constituted the loss of a homestead character which had previously attached. (*Hixon v. George,* 18 Kan. 253; *Rush v. Gordon,* 38 Kan. 535, 16 Pac. 700; *Hoffman v. Hill,* 47 Kan. 611, 28 Pac. 623; *Pitney v. Eldridge,* 58 Kan. 215, 48 Pac. 854; *Grocery Co. v. Johnson,* 114 Kan. 89, 216 Pac. 828.) Here, the question presented is one involving the abandonment of an existing homestead and the right to acquire a new homestead in a building which then constituted a strictly business structure, and was being used solely as such.

The homestead provision of our constitution (art. 15, § 9) and G. S. 1935, 60-3501, are identical. The pertinent portion thereof provides:

"A homestead to the extent of one hundred and sixty acres of farming land, or of one acre within the limits of an incorporated town or city, *occupied as a residence* by the family of the owner, *together with all the improvements on the same,* shall be exempted from forced sale under any process of law, . . ." (Italics inserted.)

Certainly this homestead provision has been liberally interpreted. It is only proper it should be so construed in order to effectuate the beneficent purpose of its framers. Its purpose was stated early in our history. In the case of *Morris v. Ward,* 5 Kan. 239, it was said, concerning a homestead:

"It was not established for the benefit of the husband alone, but for the benefit of the family and of society—to protect the family from destitution, and society from the danger of her citizens becoming paupers." (p. 244.)

Does a continuation of its liberal construction, however, require a perversion of its reasonable intendment? We do not think so. A homestead represents the dwelling house where the family resides. Its tests frequently have been stated as consisting of use and quantity. (*Bebb v. Crowe,* 39 Kan. 342, 18 Pac. 223; *Grocery Co. v. Johnson,* supra; *Barten v. Martin,* supra.) The extent of its quantity, both within and without an incorporated city, is defined by law. Its use as a homestead, according to both statutory and constitutional mandate, must be determined by its occupancy as a residence, a dwelling place, and not as a business house. It is therefore entirely natural and proper to assume the framers of the law intended if any departure for business purposes was indulged such departure should be of an incidental character. Obviously, it was not intended the exemption should attach to property used essentially

and primarily for commercial purposes and only incidentally as a residence. It seems to us a contrary construction of intent does violence to both the letter and the spirit of the law. While the protection of the homestead in keeping with the legislative intent is highly proper and necessary, it obviously was not the intent a provision of such beneficent purpose should become the shield of evasion and palpable wrong. Surely to that doctrine we must all subscribe. Our difficulty here, as in most problems, arises in relation to its application. As an orderly approach to the problem let us put a question. May an owner of a one-hundred-and-sixty-acre tract of "farming land" or a one-acre tract of land within an incorporated town or city, devote the same to any lawful business purposes he may see fit, and retain the exemption in its entirety simply by reason of his family's residence thereon?

For example, does a reasonable construction of the homestead provision, to wit, "occupied as a residence, together with all improvements on the same," require the exemption of a public grist mill separately operated as an independent business by a farmer on land which embraced less than 160 acres? In an early opinion of this court, written by the late Mr. Justice Brewer, it was held such grist mill was not exempt from execution. (*Mouriquand v. Hart,* 22 Kan. 594.) The author of that opinion directed attention to the fact that our constitutional provision referred to "farming land," and not merely to "land," as is the case in many constitutions. In the Hart case the opinion was rested largely on a yet earlier case. In the earlier case, in which the question of exemption arose relative to a lot containing two rented houses, which ground was adjacent to the lot occupied by the owner, it was held the rental property was not exempt. (*Ashton v. Ingle,* 20 Kan. 670.) In that case it was claimed the homestead exemption prescribed no limitation upon the use of the land specified, by explicitly exempting from sale one entire acre in an incorporated city, if the family of the owner resided thereon, *together with all improvements.* The decision in that case has been cited so frequently and its reasoning is so clear and convincing, we shall quote from it somewhat liberally. It was there said:

"Now the property in order to be exempt must be '*a homestead,*' or a part of a homestead, and it must be '*occupied*' as a '*residence* by the *family* of the owner.' Now the two *small* houses were not a part of Ashton's homestead in fact, whatever they might be *constructively.* And they were not '*occupied*' at all by Ashton's family, either as a '*residence*' or otherwise. Mr. Justice

Bradley, of the supreme court of the United States, in commenting upon the homestead exemption provision in the constitution of Florida, uses the following language: 'In the case of a farmer, therefore, it is clear that the exemption embraces his house and farm, not exceeding the amount limited (160 acres, without regard to value). Of course, it includes (and so the constitution declares) the improvements thereon. Those improvements, however, must be such as to make them properly a part of the homestead, such as outhouses, barns, sheds, wagon houses, fences, etc. *They would not embrace tenant houses,* though built on the farm, for these would be no proper part of the farm homestead. They constitute capital separately invested. They produce a revenue of their own, distinct from that of the farm. For the same reason, the farmer's homestead would not include a sawmill, or gristmill, or a carding-and-fulling mill, though erected on a portion of the tract of which the farm is a part. These are separate enterprises, in which the farmer has been enabled to invest his surplus capital. They are no part of the farm. If he runs them, he does it as a separate business from that of his farm, and he cannot claim both as appurtenant to and part of his homestead. They constitute the basis of outside and separate industries.' (*Greeley v. Scott,* 2 Wood's Rep. 657, 659.) The foregoing views of Mr. Justice Bradley are fully sustained by the following cases: *Casselman v. Packard,* 16 Wis. 114; *Kurz v. Bursch,* 13 Ia. 371; *Rhodes v. McCormick,* 4 Ia. 368; *Hoit v. Webb,* 36 N. H. 158; *Dyson v. Shelley,* 11 Mich. 527; *Gregg v. Bostwick,* 33 Cal. 220; *Iken v. Olenick,* 42 Tex. 195." (p. 678.)

After a careful consideration of the question and a review of the authorities, this court concluded:

"In order that anything shall be a part of the homestead, it must not only be connected therewith as one piece of land is connected with another to which it adjoins, but it must also be used in connection therewith and as part thereof. In legal phrase, it must be appurtenant thereto. Any other view than this would allow an owner of real estate in a city to own hundreds of thousands of dollars' worth of property exempt from his just and legal debts. He could cover his acre of ground with costly buildings, rent a portion thereof to various families for residences, rent other portions for business purposes, other portions for manufacturing purposes, and others still for offices, and reserve merely one, two, three, or four rooms for his own use as a residence, and then hold all these buildings, and the acre of ground, exempt from his just debts. The framers of the constitution and of the exemption laws certainly never contemplated any such result from their labors." (p. 682.)

What about the use of a single building? Does the letter or spirit of the law support an exemption of its unrestricted use for commercial purposes or are the words, "occupied as a residence," to receive a reasonable interpretation? Shall it receive a mere mechanical construction which will exempt a huge business structure covering most or all of an acre within an incorporated city? It may be urged such an illustration is somewhat overdrawn for the size of Kansas communities. Perhaps so, but it seems to us the principle

is the same. Let us, however, suggest a somewhat smaller and more modest venture. Supposing the enterprising head of a family should choose to construct and include under one roof in Kansas City, Wichita or Topeka, a theater, bowling alley, dance hall, beauty parlor, barber shop, candy kitchen, newsstand, cigar and sporting goods counter, beer parlor and perhaps a few additional attractions, and with a two-, three- or four-room apartment on the upper floor, and with proper stairways or elevators for necessary ingress and egress, could it reasonably be said the portion of the building rented for these various business purposes was necessary or even convenient for the use of the family, independent of the business? Could it truly be said such business uses were consistent with the homestead character of the premises as contemplated by the lawmakers and hence the entire structure was exempt as a homestead? Would it not be more reasonable, and more nearly in keeping with both the letter and spirit of the law, to say the portions of the building devoted to business purposes had been abandoned for use as a homestead, if they indeed ever attached? In the case of *Barten v. Martin,* supra, it was held:

"In order to reach a conclusion that a part or portion of a homestead has been excluded therefrom and has lost its right of exemption from execution as a homestead, the renting of it for a particular purpose and the surrounding circumstances should show an intention to abandon it as a homestead, and the use to which it was put in connection with the rest of the premises should be inconsistent with the homestead character of the premises." (Syl. ¶ 2.)

In the theater, in the instant case, no provision had ever been made for a residence. The entire building, prior to Mrs. Shannon's entrance, had been strictly of a business character; no homestead character had attached, and all of her conduct after she resided there was completely consistent with the continued use of the great bulk of it for business purposes. We are not unmindful of the fact it has been held the exemption does not depend upon the particular style of the building or even that it would be more valuable as a place of business than as a dwelling house. (*Bebb v. Crowe* and *Grocery Co. v. Johnson,* supra.) It does, however, depend upon whether it is actually occupied or used as the residence of the family. (*Grocery Co. v. Johnson,* supra.) We do not think that requirement is met by simply moving into and residing in a building which was not a home, but which was then and which continued to be essentially and practically a business house.

In the Bebb case a small addition was built against the residence and used a part of the time as a butcher shop by the owner, and sometimes it was leased as an office. The question was whether such occupancy of the addition would destroy the homestead right of the owners in that part of the building. The exemption was, of course, allowed. It was, however, there said:

"The owner reserved the right to go to and from the stairway leading to the second story; without that right the part of the building occupied by the family would have been less convenient; their most easy way of ingress and egress, being by way of the stairs, reached by going through the store room, would have been cut off. But leaving out this right to go through this room, which seemed almost indispensable in this instance, why should not an owner do as he wishes with his own building, when it is in reality his own residence, the abode, the dwelling house, the home of his family? *Of course if it should practically become a business house rather than a home, it would then cease to be exempt.*" (p. 346.) (Italics inserted.)

In the more recent case of *Barten v. Martin,* supra (decided in 1931), this court again reviewed the Bebb case, with others, and quoted the distinction made in the Bebb case, to wit:

" 'Of course, if it should practically become a business house rather than a home, it would then cease to be exempt.' " (p. 331.)

In the case before us the building did not eventually become a business house. It had never been anything else. The trial court found that after Mrs. Shannon moved into it the property was mostly used for business purposes and was not her homestead. We think the trial court was right.

The second ground of appeal is the alleged erroneous confirmation of the sale of the theater property. The contention here is the sales were invalid, as they were not made according to the provisions of G. S. 1935, 60-3426. The motion of defendant to set aside the sale was on the ground the property constituted a homestead, and not on the ground the sales were in violation of the above statute. Defendant directs our attention to the fact the sheriff's testimony disclosed he had not made the returns as required by law. Defendant's point in that regard may be well taken, but we find no written objection to the confirmation, from which the appeal was taken, and nothing in the record otherwise indicating the attention of the trial court was called to the alleged invalidating effect resulting from a failure to strictly comply with the statute. Had the matter been called expressly to the attention of the trial court the sale might not have been confirmed. Since it does not affirmatively ap-

pear the point was presented to and determined by the trial court, we cannot consider it on appeal. (*Sleeper v. Bullen & Dustin et al.,* 6 Kan. 300; *Kelly v. Insurance Co.,* 101 Kan. 636, 168 Pac. 686; *Houser v. Nelson,* 133 Kan. 142, 298 Pac. 777; *Arkansas River Gas Co. v. Molk,* 135 Kan. 152, 156, 9 P. 2d 623.)

The judgment is affirmed.