In re: **Frank Richard GARSTECKI,**
**Debtor.**

**No. 04–25006.**

United States Bankruptcy Court,
D. Kansas.

Aug. 16, 2006.

Eric C. Rajala, Overland Park, KS, for Frank Richard Garstecki, Debtor.

Joanne B. Stutz, Evans & Mullinix PA, Shawnee, KS, for Frontier Farm Credit, Creditor.

## MEMORANDUM DENYING OBJECTION TO EXEMPTIONS AND ADDRESSING LIEN AVOIDANCE

DALE L. SOMERS, Bankruptcy Judge.

The matter before the Court is the objection of creditor Frontier Farm Credit, aka Farm Credit Services (hereafter "FCS") to the Debtor's homestead and

vehicle exemptions[1] and Debtor's related motion to avoid lien of FCS.[2] FCS appears by Joanne B. Stutz of Evans & Mullinax, P.A. Debtor, Frank Richard Gatstecki (hereafter "Debtor"), appears by Eric C. Rajala. There are no other appearances. The Court has jurisdiction.[3] The matter was taken under advisement upon the filing of stipulated facts and briefs.

## I. FINDINGS OF FACT.

The Court's findings of fact are based upon the pleadings and adoption of the parties' stipulations of fact. The Debtor's Chapter 7 bankruptcy petition was filed on November 30, 2004, by Melanie S. Gorden, the Debtor's granddaughter and conservator. As of the date of filing, the Debtor was a 72 old single person residing at Vintage Nursing Home, located in Baldwin, Kansas. The Debtor's exemptions listed in his schedules included a tract of farm land located in Osage County, Kansas, claimed as his homestead pursuant to K.S.A. 60–2301 and a 2005 Ford Focus, claimed as an exempt vehicle, pursuant to K.S.A. 60–2304(c). Soon after filing, Debtor filed a motion to avoid judicial lien of FCS on the homestead property[4] pursuant to § 522(f).[5] FCS objected to the avoidance of the lien and to exemption of the homestead and the Ford Focus.[6]

On May 4, 1987, a mortgage foreclosure judgment in the amount of $188,728.75, plus interest at the rate of $76.02 from and after May 4, 1987, was entered against the Debtor in *Federal Land Bank, Wichita, n/k/a Farm Credit Services v. Frank R. Garstekci,* Case no. 86 C 104 in the District Court of Miami County, Kansas, foreclosing plaintiff's mortgage on Debtor's former homestead in Miami County, Kansas. The property sold at sheriff's sale on June 11, 1987, leaving a deficiency balance of $103,909.05.

Commencing in August 1995, the Debtor resided at his new homestead in Osage County, Kansas, located at 27010 U.S. 75 Highway, Lyndon, Kansas. The homestead consists of a farm, a residence, and outbuildings on 158.6 acres of farm ground, where he bred and raised cattle. On July 5, 1996, the Miami County judgment was filed as Case Number 96 JL 4 in the District Court of Osage County, Kansas. The parties have stipulated that this created a judgment lien which clouds the title to the Osage County property claimed as exempt and that the lien was revived by the filing of the renewal affidavit in Case No. 96 JL 4 on June 15, 2001. As of the date of filing, the balance owed on the

1. Doc. 13.

2. Doc. 6.

3. This Court has jurisdiction pursuant to 28 U.S.C. § 157(a) and §§ 1334(a) and (b) and the Standing Order of the United States District Court for the District of Kansas that exercised authority conferred by § 157(a) to refer to the District's Bankruptcy judges all matters under the Bankruptcy Code and all proceedings arising under the Code or arising in or related to a case under the Code, effective July 10, 1984. A motion seeking the disallowance of an exemption and a motion to determine the validity and extent of liens are core proceedings which this Court may hear and determine as provided in 28 U.S.C.

§ 157(b)(2)(B) and (K). There is no objection to venue or jurisdiction over the parties.

4. Doc. 6.

5. 11 U.S.C. § 522(f) (1984). This case was filed before October 17, 2005, when most provisions of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 become effective. All statutory references to the Bankruptcy Code are to 11 U.S.C. §§ 101—1330 (2004), unless otherwise specified. All references to the Federal Rules of Bankruptcy Procedure are to Fed. R. Bankr.P. (2004), unless otherwise specified.

6. Doc 11 and Doc. 13.

judgment (including post judgment interest) was $368,164.90, plus interest at the rate of $41.85234 per diem.

In April, 2003, the Debtor's children and grandchildren discovered that Debtor's mental and physical health had begun to deteriorate, as evidenced by his inability to maintain his checking account; the issuance of a warrant of arrest for his failure to properly dispose of the carcass of a dead cow on his property; the purchase of hay on credit over several years, but unjustifiably refusing to pay for any of it; the inappropriate setting of fires in his fields on dry days; failure to control the thistle on his property; and mismanagement of the farm. From April through August 2003, Debtor's family assisted him in the operation and maintenance of the farm, so he could continue to live there independently for as long as possible. As a part of this effort, the Debtor executed a Durable Power of Attorney on April 18, 2003, appointing Melanie S. Gorden as his Attorney–in–Fact.

In August 2003, the Debtor's daughter, Karin Garstecki, a registered nurse, found that the Debtor was passing blood clots in his urinary tract, which required emergency prostate surgery. For four days after his emergency surgery, the Debtor had to be physically restrained from ripping out his blood monitor and catheter and leaving the hospital to go home to "feed the cows." Debtor spent the next several months, from August 2003 through January 2004, convalescing at Karen Garstecki's home in Ottawa, Kansas. During his convalescence, Debtor became increasingly hostile and uncontrollable. On September 8, 2003, the family was forced to involuntarily commit the Debtor to the care of Research Psychiatric Center in Kansas City, Missouri for psychiatric evaluation and treatment. Upon conclusion of Debtor's involuntary commitment, the Debtor's physician determined that Debtor could no longer live independently; he would either have to stay at the Psychiatric Center or stay with his daughter. After the family confronted the Debtor with this information, the Debtor agreed to return to Karin Garstecki's home. On two occasions before February 10, 2004, Debtor was found outside attempting to get into a vehicle to go to the farm.

The Debtor's physician also recommended that a guardian and conservator be appointed for Debtor. Debtor's family filed a petition in the District Court of Osage County, Kansas, seeking a determination that the Debtor was an impaired adult in need of care. On October 22, 2003, Letters of Conservatorship were issued appointing Ms. Gorden as conservator, with all powers and duties of a conservator as set out in K.S.A. 59–3078. Karin Garstecki and Richard L. Garstecki were appointed as Debtor's co-guardians.

On December 17, 2003, Debtor became ill and was admitted to Olathe Medical Center, suffering from pneumonia in both lungs and heart failure. He was treated and released. In January, 2004, Debtor began exhibiting agitation and mood swings, and his behavior became more confrontational. As a result, he was admitted into the geriatric psychiatric unit at Lawrence Memorial Hospital. Debtor's physicians at Lawrence Memorial Hospital evaluated Debtor. They advised that it was not safe for Debtor to live in the home of family members, as he required 24–hour a day professional care. Based on this recommendation, the Debtor's guardians submitted a revised guardianship plan to the Osage County Court. In accord with the revised plan, on January 28, 2004, Debtor was released from Lawrence Memorial Hospital and was taken to live at the Brookside Care Center in Overbrook, Kan-

sas, where his medications and behavior could be closely monitored.

Because the Debtor could no longer physically reside at his homestead due to his mental and physical incapacity, and in order to generate funds to pay Debtor's ongoing living expenses and medical expenses, Ms. Gorden, the conservator, and Debtor's co-guardians, on June 3, 2004, sought[7] and obtained an order from the District Court of Osage County authorizing the sale of the Debtor's real and personal property. The farm property was under a sale contract, and the proceeds from the sale were not intended by the Debtor's conservator to be used to purchase another home for Debtor, who lacked the ability to reside anywhere other than in a nursing facility. The proposed sale of the of the real property could not be consummated because of the judgment lien of FCS in case number 96 JL 4, District Court of Osage County, Kansas.

In September 2004, the Debtor's family determined that the Debtor no longer needed the level of services offered at Brookside, and moved him to Vintage Park Nursing Home in Baldwin City, Kansas. The Debtor currently is being treated for cardiac problems. He must be taken monthly to Olathe Medical Center in Olathe, Kansas, for cardiology related treatment, and twice per month for appointments with his physician. The round trip from Baldwin to Olathe is approximately 50 miles.

On October 14, 2004, Ms. Gorden, the conservator, obtained an order from the District Court of Osage County, Kansas, authorizing the filing of the bankruptcy petition. On the same date, she obtained an order authorizing the conversion of the Debtor's nonexempt assets into exempt assets and particularly authorizing the purchase of an exempt motor vehicle on behalf of the Debtor. On October 23, 2004, Ms. Gordon purchased a 2004 Ford Focus automobile in both her and the Debtor's names on behalf of the Debtor, which the Debtor's family members use for the exclusive purpose of conveying the Debtor to appointments with his medical care providers.

## II. ON THE DATE OF FILING, WAS THE OSAGE COUNTY FARM THE DEBTORS' HOMESTEAD?

### A. Parties' positions.

Debtor and FCS agree that the Osage County farm was Debtor's homestead starting in August, 1995. Debtor contends the homestead continued until the date of filing because there is no positive and clear evidence that Debtor intends not to return to his Osage County residence. FCS contends the property was no longer the Debtor's homestead when he filed his bankruptcy petition because Debtor did not reside on the farm and had no intention of returning to the property. The acts of Debtor's co-guardians and conservator, in seeking approval to sell the homestead, entering into a contract for sale, and intending not to use the proceeds to purchase another homestead, are, under FCS's theory, to be imputed to the Debtor. As one would expect, the Debtor argues that the intention of the co-guardians and conservator is not to be imputed to him, that his inability to live independently at the homestead is irrelevant, and FCS has not sustained its burden of proof that Debtor does not intend to return to the homestead.

---

**7.** Although the pleading is entitled "Application of Guardian for Permission to Sell Real Estate Property at 27010 Hwy. 75 Lyndon KS 66451," the document is signed by the conservator and the co-guardians.

### B. Analysis.

■ Section 522 of the Code governs exemptions.[8] Subsection (b) allows the states to prohibit their citizens from choosing the federal exemptions set forth in subsection (d) and to require the use of state exemptions. Kansas has opted out of the federal plan and enacted its own exemptions.[9] The applicable exemption for Debtor's homestead is K.S.A. 60–2301, which states:

> A homestead to the extent of 160 acres of farming land, or of one acre within the limits of an incorporated town or city, or a manufactured home or mobile home, occupied as a residence by the owner or by the family of the owner, or by both the owner and the family thereof, together with all the improvements on the same, shall be exempted from forced sale under any process of law, and shall not be alienated without the joint consent of husband and wife, when that relation exists; but no property shall be exempt from sale for taxes, or for the payment of obligations contracted for the purchase of said premises, or for the erection of improvements thereon. The provisions of this section shall not apply to any process of law obtained by virtue of the lien given by the consent of both husband and wife, when that relation exists.

The Code and case law make it clear that a debtor's exemption rights are determined as of the date of filing of the petition.[10] Once the debtor claims an exemption, the objecting party has the burden of proof.[11]

■ When determining the validity of the exemption claimed under state law, the bankruptcy courts look to state law.[12] Under Kansas law, exemptions are to be liberally construed in favor of the claimant.[13] This is particularly true for the Kansas homestead exemption, which has been liberally construed to effectuate purpose of protecting "the family from destitution, and society from the danger of her citizens becoming paupers." [14]

■ In this case it is undisputed that a homestead existed. The question is whether it was abandoned as of the date of filing. The Kansas Court of Appeals has addressed abandonment as follows:

> Once it has been established that a homestead interest in property exists, then the burden of proof is on the party attempting to defeat that interest to

---

**8.** 11 U.S.C. § 522.

**9.** K.S.A. 60–2312.

**10.** 11 U.S.C. § 522(b); *Mansell v.Carroll (In re Mansell)*, 379 F.2d 682, 684 (10th Cir.1967) (holding "[i]n a bankruptcy proceeding the determination of what property is exempt is made as of the date of filing . . . ."); *Lampe v. Iola Bank & Trust (In re Lampe)*, 278 B.R. 205, 210 (10th Cir.BAP2002) aff'd 331 F.3d 750 (10th Cir.2003) (holding that debtor's right to exemption is determined as of date petition is filed); *In re Johnson*, 19 B.R. 371, 374 (Bankr.D.Kan.1982) (holding that "[e]xemption rights in bankruptcy are determined as of the date the petition is filed").

**11.** *Lampe v. Williamson (In re Lampe)*, 331 F.3d 750, 754 (10th Cir.2003).

**12.** *In re Lampe*, 331 F.3d at 754.

**13.** *Id.*, quoting *In re Ginther*, 282 B.R. 16, 19 (Bankr.D.Kan.2002).

**14.** *Anderson v. Shannon*, 146 Kan. 704, 711, 73 P.2d 5, 10 (1937), quoting *Morris v. Ward*, 5 Kan. 239, 244 (1869); *see e.g., State ex rel, v. Tract of Land*, 251 Kan. 685, 687, 840 P.2d 453, 455 (1992) (stating "Kansas has zealously protected the family rights in homestead property by liberally construing the homestead provision in order to safeguard its humanitarian and soundly social and economic purposes"), quoting *State ex rel., v. Mitchell*, 194 Kan. 463, 466, 399 P.2d 556 (1965).

show by positive and clear evidence that the homestead has been abandoned, as there is a presumption that once established the homestead continues unless the contrary is shown. Whether a homestead has been abandoned is a question for the trier of fact. Two tests must be met before a homestead interest may be destroyed or abandoned: (1) there must be a removal from the property, and (2) there must be an intent not to return.[15]

"The personal intention of the person having the homestead to abandon it is therefore essential."[16] Further, the absence from the premises must be voluntary, as absence "that is involuntary or compulsory does not constitute a relinquishment of homestead rights."[17]

Debtor is no longer living on the homestead, so the removal element of FCS's burden of proof is satisfied. To establish the element of intent not to return, FCS relies on the circumstances of the Debtor on the date of filing and the actions of Debtor's conservator and co-guardians. Debtor contends FCS has not satisfied its burden of proof.

Debtor correctly argues that all of the Debtor's overt actions are consistent with intent to return to the farm. When first hospitalized in August 2003, Debtor needed to be physically restrained from leaving the hospital to go home to feed the cows. In the winter of 2004, when living with Karen Garstecki, Debtor was twice found outside attempting to get into a vehicle to return to the farm. Debtor did not voluntarily choose to live other than on his farm; he was compelled to do so by his medical condition and for his personal safety. Debtor's involuntary removal does not evidence intent to abandon the homestead.

■ The Court finds that Debtor's living arrangement, coupled with the stipulated fact that he will not be returning to the farm because he is physically and mentally incapable to do so, do not constitute positive and clear evidence of abandonment of the homestead. The Kansas Court of Appeals, in *In re Estate of Phillippe*[18] has rejected the notion that an elderly person's residency in a nursing home because of serious illness establishes intent to abandon a previously established homestead. In *Phillippe*, the Kansas Department of Social and Rehabilitative Services (SRS) sought to overturn the trial court's finding that the decedent, Abe Phillippe, had not abandoned his homestead, where he had lived for 20 years. Being diagnosed with cancer in 1991, Abe moved to a nursing home because his son could no longer provide the care he needed. Abe lived in the nursing home until his death in October, 1994. SRS then petitioned for a lien on Abe's former home. The Court Appeals found that "[t]he only evidence possibly indicating Abe did not intend to return is the fact that, after his move to the nursing home, Abe stopped filing for a homestead tax exemption."[19] The District Court was not persuaded by this evidence, and the Court of Appeals affirmed the trail court its ruling the SRS had failed to sustain its burden of proof to show that

---

**15.** *In re Estate of Fink*, 4 Kan.App.2d 523, 527–28, 609 P.2d 211, 216 (1980) rev. denied 228 Kan. 806 (1980) (citations omitted).

**16.** *Bellport v. Harder*, 196 Kan. 294, 300, 411 P.2d 725, 730 (1966).

**17.** 40 Am.Jur.2d Homestead § 176 (2005); *see Meech v. Grigsby*, 153 Kan. 784, 787, 113 P.2d 1091, 1093 (1941) (holding that to constitute abandonment of a homestead the abandonment must be voluntary).

**18.** 23 Kan.App.2d 436, 933 P.2d 151 (1997) rev. denied April 30, 1997.

**19.** *Id.*, 23 Kan.App.2d at 438, 933 P.2d at 153.

the homestead had been abandoned.[20] The Court of Appeals did not fault the trial court for taking judicial notice that "there isn't a person that ever went into a care home that didn't want to come home," finding he trial court's statement was in accord with the legal proposition that a homestead is presumed to continue until the contrary is shown.[21] Here, as in *Phillippe*, Debtor's illness, the necessity of his residing where he can be given 24 hour professional care, and the fact that he cannot return to his farm are insufficient to evidence his personal intent to abandon the homestead.

To overcome the lack of evidence of Debtor's personal intent, FCS urges that the actions and decisions of the Debtor's conservator and co-guardians should be imputed to Debtor. Intent to abandon, according to FCS, is evidenced by the fact that the conservator and co-guardians sought and obtained approval for sale of the homestead from the District Court for the purpose of using the sale proceeds to pay for Debtor's medical and long-term needs, not the purchase of a new homestead. In response, Debtor first notes that the sale did not close. Debtor also argues that although a conservator's job is to manage the property of the impaired conservatee, to the extent the conservatee lacks the ability to do so, the conservatee does not relinquish his free will. According to Debtor, a decision of a conservator that the sale of a homestead is in the best interests of the ward can be made, and in this case was made, notwithstanding the ward's desire to retain the property and return to it.

To evaluate these positions, the Court examines the powers granted Debtor's conservator and co-guardians. The Letters of Conservatorship, filed on October 22, 2004, granted Melanie S. Gorden, the conservator of Debtor, "all powers and duties of a conservator as set out in K.S.A. 59–3078 and amendments thereto." That statute provides in relevant part as follows:

(a)(1) The individual or corporation appointed by the court to serve as the conservator shall carry out diligently and in good faith the general duties and responsibilities, and shall have the general powers and authorities, provided for in this section, as well as any specific duties, responsibilities, powers and authorities assigned to the conservator by the court. . . .

(2) A conservator, in the exercise of the conservator's responsibilities and authorities, should become aware of the conservatee's needs and responsibilities. A conservator shall exercise authority only as necessitated by the conservatee's limitations. A conservator shall encourage the conservatee to participate in the making of decisions affecting the conservatee's estate. A conservator shall encourage the conservatee to manage as much of the conservatee's estate as the conservatee is able to manage. A conservator shall consider and, to the extent possible, act in accordance with the expressed desires and personal values of the conservatee. . . .

(b) A conservator shall have the following general duties, responsibilities, powers and authorities:

\* \* \* \* \* \*

(5) to sell assets of the conservatee's estate when the interest of the conservatee or conservatee's estate require the sale thereof;

\* \* \* \* \* \*

20. *Id.*

21. *Id.*

(f) A conservator shall not have the power:

\*     \*     \*     \*     \*     \*

(2) to sell, convey, lease or mortgage the conservatee's interest in the homestead of the conservatee, except with the approval of the court, . . . [22]

The foregoing gives a conservator the express authority to sell a homestead, subject to court approval. Under an earlier version of the probate code, which did not expressly address sale of the homestead and which granted a guardian powers similar to those now granted to a conservator, the Kansas Supreme Court found such power existed. *In re Younkin's Estate*,[23] the court held that when, with court approval, a guardian sold the ward's homestead interest, the sale was in actuality a sale by the court with the deed being executed by the guardian of the ward, as her legally appointed representative. Given the fact that an insane person can not give a valid personal consent to the alienation of his or her property, the consent of the guardian to alienate the ward's property, under approval of the probate court, was held to constitute a "legally substituted consent." [24]

The current conservatorship statute, quoted above, clearly preserves to the conservatee the ability to make some decisions regarding property interests. Although this was a new provision when the current Act for Obtaining a Guardian or Conservator was enacted in 2002,[25] it is in accord with then existing Kansas case law. For example, a conservatee has been found to have the capacity to change the payable on death beneficiary of United States treasury bonds [26] and to change the beneficiary on payment on death bank accounts.[27] "A conservator is not the alter ego of the conservatee and the decision to terminate joint accounts or change a beneficiary is a purely personal elective right of the conservatee." [28] Rather that succeeding to the full discretionary personal rights of the conservatee in a jointly held account, the conservator may withdraw funds from such accounts only to provide what is necessary for the conservatee's maintenance.[29]

The record does not include the order appointing the co-guardians or other document which states the authority of the co-guardians in general. However, the statute addressing guardianship powers, like the one addressing powers of conservators, preserves many powers to the ward. It provides in part: "A guardian shall encourage the ward to participate in making decisions affecting the ward. A guardian shall encourage the ward to act on the ward's own behalf to the extent the ward is able." [30] It expressly provides that the guardian shall not have power "to exercise any control or authority over the ward's

22.  K.S.A.2003 Supp. 59–3078

23.  *Lockridge v. Glace (In re Younkin's Estate)*, 158 Kan. 431, 147 P.2d 726 (1944).

24.  *Id.*, 158 Kan. at 436, 147 P.2d at 730.

25.  Molzen, *Overview of the New Guardianship and Conservator Act*, 71 J. Kan. B. Ass. 25 (2002).

26.  *Union Nat'l Bank of Wichita v. Mayberry*, 216 Kan. 757, 533 P.2d 1303 (1975).

27.  *Campbell v. Black*, 17 Kan.App.2d 799, 844 P.2d 759 (1993).

28.  *Estate of Briley*, 16 Kan.App.2d 546, 549, 825 P.2d 1181, 1184 (1992).

29.  *Id;* This Kansas rule is in accord with the "general rule" that neither a conservator nor a guardian may waive legal rights on behalf of the conservatee or ward or surrender or impair vested rights. 39 Am.Jur.2d *Guardian and Ward* § 128 (2005).

30.  K.S.A.2003 Supp. 59–3075(a)(2).

estate, except if the court shall specifically authorize such."[31]

The question presented by this case is whether the Debtor's conservator's and co-guardians' determinations regarding the Debtor's homestead constitute abandonment of the homestead by the Debtor. The conservator and co-guardians determined that sale, to obtain funds for the Debtor's care and medical expenses, would be in the best interests of the Debtor. The conservator entered into a contract of sale, which was approved by the state court. However, as provided in the stipulation, the proposed sale of the real property could not be consummated because of the judgment lien of FCS.

The Court finds that these actions did not constitute an abandonment of the Debtor's homestead interest. Most importantly, the sale did not close. Although the parties have not cited and the Court's research has not disclosed any Kansas case on the issue, other courts have held that preparations and attempts to sell a homestead do not constitute abandonment.[32] This rule is consistent with the Kansas presumption that the homestead continues. Entering into a contract for sale and then not performing that sale because of adverse consequences of loss of homestead protection if the proceeds are not used to purchase another homestead is completely consistent with the Kansas policy of liberally construing the exemption to protect persons from becoming destitute. In addition, the actions upon which FCS relies were made by the co-guardians and conservator, who are not the alter egos of the Debtor. Under the conservatorship statute, the Debtor retains personal rights; as long as the ward owns the homestead, the ward, not the conservator, retains the right to waive the protection afforded homesteads. Under the guardianship statute, the ward retained all authority not transferred to the co-guardians because such transfer was necessitated by the ward's condition, and the co-guardians could exercise no control or authority as to the Debtor's assets, except as approved by the court. The state court's approval of the sale of the homestead was premised upon the proceeds becoming available for use by the Debtor.

The conservator also is the Debtor's attorney-in-fact under a Durable Power of Attorney executed on April 18, 2003, before the establishment of the guardianship and the conservatorship. That document grants Ms. Gorden the power to "sell, contract to sell, mortgage, encumber, exchange, lease, or rent ... real estate ..., whether such real estate be homestead or non-homestead ... property." Contrary to FCS's contention, the Court finds that the authority granted by the Durable Power of Attorney does not render Ms. Gorden's determination, that the sale of the homestead would be in the best interests of the Debtor, an abandonment of the homestead by the Debtor. The Durable Power of Attorney authorized the attorney-in-fact, in the "place and stead" of the Debtor, "to do and perform all acts, deeds, matters and things whatsoever concerning my property and personal affairs necessary and advisable in the judgment of my said Attorney–in–Fact ...." It authorizes acts on behalf of the Debtor, and the sale of the homestead would have been binding if it had closed. But there was no sale. Contrary to the position of FCS, Debtor

---

**31.** K.S.A.2003 Supp. 59–3075(e)(8).

**32.** *In re Chalin,* 21 B.R. 885 (Bankr.W.D.La. 1982) (applying Louisiana law); *Falconer v.* *Farmers Union Oil Co.,* 260 N.W.2d 1 (N.D. 1977) (applying North Dakota law).

did not give away his intent; he only authorized another to act on his behalf.

## C. Conclusion.

For the foregoing reasons the Court finds that Debtor's Osage County farm was his homestead on the date of filing. FCS has not sustained its burden of proof to establish that Debtor had no intent to return to his farm. The objection of FCS to Debtor's exemption of his farm is not sustained.

## III. IS DEBTOR ENTITLED TO AVOID FCS'S LIEN ON THE HOMESTEAD PURSUANT TO § 522(f)?

Section 522(f)(1)(A) of the Code allows a debtor to "avoid the fixing of a lien on an interest of the debtor in property to the extent that such lien impairs an exemption to which the debtor would have been entitled under subsection (b) of this section, if such lien is ... a judicial lien." Debtor seeks to avoid the lien of FCS on his Osage County farm, which, as the Court has found above, is exempt as his homestead. FCS opposes the motion only on the basis that the Osage County farm was not a homestead.

■■■ While the documents included in the record are not sufficient to establish whether FCS in fact has a judgment lien on real property of the Debtor in Osage County, the parties have stipulated that a judgment lien exists, and the Court will assume that the parties have examined the appropriate court records to satisfy themselves that they are sufficient to give rise

to a lien. However, in Kansas, a judgment lien does not attach to a homestead.[33] Lien avoidance is available only when a lien is "fixed" to an exiting property interest of the debtor.[34] A lien is fixed when there is a fastening of liability.[35] In this case, because the Debtor's real property located in Osage County has been determined to be his homestead, the lien of FCS was not fixed to that property, and there is no basis for, or need for, lien avoidance. In the alternative, if the Court is in error and the parties' stipulation that the lien attached to the homestead is correct, the conditions for avoidance of such lien under § 522(f)(1)(A) are established.

For the foregoing reasons, the Court holds that the Debtor's Osage County homestead is not subject to a judgment lien arising from the recording of the FCS judgment in Osage County.

## IV. ON THE DATE OF FILING WAS THE DEBTOR ENTITLED TO EXEMPT THE FORD FOCUS?

In addition to objecting to Debtor's homestead exemption, FCS also objected to the exemption of the Ford Focus. In Kansas, each resident shall have exempt "[s]uch person's interest, not to exceed $20,000 in value, in one means of conveyance regularly used for the transportation of the person or for transportation to and from the person's regular place of work, ... "[36] This personal exemption, like the homestead exemption, is liberally construed in favor of the exemption.[37]

■■■ The Court finds that three elements must be satisfied: Debtor must

---

33. *Morris v. Ward*, 5 Kan. 239 (1869).

34. *Farrey v. Sanderfoot*, 500 U.S. 291, 296, 111 S.Ct. 1825, 114 L.Ed.2d 337 (1991).

35. *Id.*

36. K.S.A. 60–2304(c).

37. *In re Carpenter*, Case no. 02–12581, 2003 WL 23765954 (Bankr.D.Kan., Feb. 21, 2003); *see Nohinek v. Logsdon*, 6 Kan.App.2d 342, 344, 628 P.2d 257, 259 (1981).

have a property interest in the vehicle; the exempted portion must not exceed $20,000 in value; and the vehicle must be regularly used for the transportation of the Debtor or for transportation to and from the Debtor's place of work. FCS agrees that the first and second elements are satisfied. As to the third element, FCS contends that Debtor is not entitled to the exemption because the vehicle is driven by Debtor's relatives, not personally by Debtor. Debtor responds that it is stipulated that the vehicle is used exclusively for the purpose of conveying the Debtor to regular appointments with his medical care providers several times each month, thereby satisfying the exemption criteria.

■ Neither the parties nor the Court has located any authorities addressing the question whether the exemption is unavailable because the claimant is not the driver of the vehicle. The exemption statute does not state that the vehicle must be regularly driven by the claimant. Rather it states the vehicle must be regularly used for the transportation of the person, which is exactly the situation we have in this case. The Court sees no reason why the exemption statute should be narrowly construed as urged by FCS. The Kansas Court of Appeals, when construing the "reasonably necessary" condition of the Kansas household goods exemption codified in K.S.A. 60–2304(a), applied the following "established rules of statutory construction:" [38]

A statute is not to be given an arbitrary construction, according to the strict letter, but instead should be construed to advance the sense and meaning fairly

deducible from the context. Moreover, a general rule regarding exemption laws is that they are to be liberally construed in favor of those intended by the legislature to be benefited and favorable to the purposes of the enactment.[39]

The Debtor is among those intended to be benefitted by the vehicle exemption; he is an unfortunate debtor who, absent exemptions, would become destitute and a public charge.[40]

For the foregoing reasons, the Court denies FCS's objection to Debtor's exemption of the Ford Focus.

## V. CONCLUSION.

The Court rejects FCS's objection to the Debtor's exemption of the Osage County farm as his homestead and of the Ford Focus under the vehicle exemption statute. The Court holds that Debtor's homestead is not subject to any interest of FCS arising from recording of a judgment in the county where the homestead is located.

The foregoing constitute Findings of Fact and Conclusions of Law under Rules 9014(c) and 7052 of the Federal Rules of Bankruptcy Procedure and Rule 52(a) of the Federal Rules of Civil Procedure. A judgment based upon this ruling will be entered on a separate document as required by Federal Rule of Bankruptcy Procedure 9021 and Federal Rule of Civil Procedure 58.

**IT IS SO ORDERED.**

---

**38.** *Nohinek v. Logsdon,* 6 Kan.App.2d at 344, 628 P.2d at 259.

**39.** *Id. (citations omitted).*

**40.** *See Southwest Bank v. Quinn,* 198 Kan. 359, 363, 424 P.2d 620, 624 (1967) (stating

that "whole purpose and policy of our exemption laws has been to secure to an unfortunate debtor the means to support himself and his family, to keep them from being reduced to absolute destitution and thereby public charges.")